City Health. Good morning. May it please the court.        Mary Mays v. New York City Health. Mary Mays v. New York City Health. The main issue here is that Andre Berry, the plaintiff, the appellant, communication abilities were disputed. He had an extremely limited ability to read and write in English, which was recognized by the court on motion for reconsideration, when it wrongly held that he could read and write. He has a right to have medically relevant communications available to him to be as effective as hearing patients do. There were a number of consent forms. He primarily communicates in American Sign Language. That's his language. And he... Not with his family. Yes. So I understood that. Yes. He was estranged from his family for a long time. No, no, no. I meant when he was communicating with his family. Right. When they were communicating, it was not in American Sign Language. Correct, Your Honor. And that was through basic gesturing, very, very basic concepts, I love you, how are you, things of that sort. But for medically relevant communications, extensive communications about risks, complications, consent forms, medical discharge against advice, and then dying two days later. What I'm having trouble getting my head around here, in many instances, he did have a sign language interpreter, correct? Correct, Your Honor. Indeed, for the whole first almost year, there's always an interpreter. On other occasions, there are interpreters sort of sporadically while he is hospitalized. Are we to look at this somehow globally, or are we to look at individual instances? You have to treat each medical communication as an instance. You cannot look at this as a broad manner because... Okay. So on at least one occasion, the record seems to indicate that he had an interpreter the night before a procedure, but not on the morning of the procedure. And it's not 100% clear to me, but it seems that the procedure was explained to him the night before. So, I mean, in that circumstance, do we group those two? Or are you contending that he has... Because, of course, a hearing person, the next morning, might have a question or might have some reason to inquire. And he might not have had that. So we're to look at each interaction? Yes, Your Honor. And as the Second Circuit has held in right that there should not be non-trivial temporal delays of providing these accommodations. And so while it's provided the night before, Your Honor... Non-trivial. I mean, again, so a nurse comes in to check vital signs and says, Good morning, how are you doing, Mr. Berry? And he looks uncomprehending, and she realizes that there's no communication happening. Is that a violation, or are there some kinds of medical interactions that don't require communication? Well, the technical assistance manuals of the Department of Justice talks about things that are more substantive, such as consent, treatment, discussing diagnoses, things of that sort that are clearly communications that should be effective. Well, many of the forms that are here that do not have an interpreter's signature are not consents to surgery or to some specific procedure at all. They don't give any facts on them about what's going to happen. It's just you came here to be treated, and you agree that we can treat you. And these happen repetitively. Every time he comes for dialysis, for example, which he does on a regular basis. Is the absence of an interpreter to interpret that document, which he has seen before, and it says the same thing that it said on the one that he had an interpreter for months before. Is that a violation? Well, yes, Your Honor, because a hearing person would have an opportunity when presented with the consent form to have it, ask questions with the doctor, have it explained to him. Is this the same form as before, which Mr. Berry would not necessarily know because he can't read it? Or at least a jury could so find it. Well, that was not all the forms. Some of the forms were things that he had experienced in the past, but other forms were not. Could you identify your best one? There are literally dozens of interactions that take place documented in the medical records, some of which say we were able to communicate to him adequately, even though there was no interpreter present. Others, there were interpreters present. Some there were not. The ones that there were and were not vary across a spectrum from apparently routine to more complicated. Give me your best one of an example of a proceeding where quite clearly, no question, a reasonable jury could say he did not have an adequate communication. Sure. There are two. There's one where he had the femoral Sheely implanted into him, in which the doctor notes that he went through all this discussion about risks and complications and all these things where an interpreter was not present for that proceeding, and there's no way that all these things could have been communicated to him without the benefit of a sign language interpreter. Another one, when he was discharged against medical advice, an interpreter was not present for that, and he later died a few days later. And those would be two critical forms and times in which a sign language interpreter definitely should have been provided so that he could effectively communicate. Also, they are entitled to, and the regs say this, their communications must be as effective as it is with people without the disability. And so just cherry picking and saying, well, they could have explained it here or there, well, that should have been sufficient. That's not on the same equal footing as hearing people have when they have medical treatment. Also, at this point, your burden is only to establish that there are issues of fact, that a reasonable jury could find that he did not have adequate, equivalent to a hearing person, ability to be informed. Yes, Your Honor, that's absolutely correct. And the judge here makes favorable inferences in favor of the movement here by making these assumptions that it must have been explained 16 hours later or it must have been explained 14 hours before with an interpreter. Okay, get back to the left arm fistula. This is on March the 27th of 2013, and I believe that there is an informed consent for surgical procedure and consent to anesthesia, which forms were signed with an interpreter. That's Appendix 738 and 739. Okay. I don't have that appendix in front of me, Your Honor. But this is, again, the kind of thing that puzzles me as to, I mean, you, I thought you agreed in your papers that you are not contending that it is a requirement of the Rehabilitation Act that on each occasion that he interacts with medical personnel, he must have a sign language interpreter. I'm not arguing that, Your Honor. However, it sounds like that's what it comes down to because if the factual, if, as a matter of fact, in Mr. Berry's case, a jury could find that he can't communicate in writing and he can't speak in a way that is intelligible, then at least for him, it sounds like a jury could find that he needs to have an interpreter every time. Well, yes, a jury could find that, but for every single, I mean, there are simple things where he's being taken to the bathroom or he's taking his blood pressure, things like that. We're not going to argue that an interpreter should be there, but they had a- Let me ask you what was your best argument when you referred to this, you know, fibrilla operation, and I guess the concern I share is, or at least have, is that we have a record that when he gave consent for that procedure, he had an interpreter. Now, the fact that he didn't have an interpreter the next day, I mean, we recognize he might have had a question, but you have no evidence that he had a question or that his consent would have been rescinded or anything. So I'm not sure how having been given an interpreter at the critical time when he gave his consent, the question of whether he had an interpreter the next day or whenever the surgery occurred is something that caused him any damage here. I mean, it's pretty- I mean, there are other instances of this, too. When he had the vascular surgery, I mean, he had a number of interpreter services the night before, the day after, et cetera. He didn't have it on the day of the surgery. But I'm not sure I have any record basis for thinking that this caused him any injury. You know, this is not a case in which this gentleman was treated without ever having an interpreter. He had an interpreter at and about all these critical events. So what is it you're saying is the denial here, the deprivation? The denial here, Your Honor, is that he was not provided an equal opportunity to participate in his medical care, and any reasonable jury could understand that when you can't communicate during junctures, during your medical care, that that can cause frustration, emotional distress. Did it? Yes, Your Honor. And what's the basis for that? The basis for that is their own medical records where it says Mr. Berry is frustrated when being talked to, and then also Denise Berry, his sister, was there during one time where they used a video remote interpreting system and it didn't work and they didn't know how to set it up, and at that point the doctor just got so frustrated and then he walked out of the room because he couldn't communicate with Mr. Berry, and she was present for that, and she saw Mr. Berry's frustration with the communication there. Just to be clear. That same morning, that same morning, he was offered a sign language interpreter and he refused to sign the sign language interpreting service. That was the day he refused to sign, and then despite the refusal, the hospital arranged for an interpreter for three hours that evening. I mean, this hardly suggests a record of disregard for his needs. Well, they have a video remote interpreting system available to them 24-7. They can bring in this machine at any point in time, so any time that they need to have any sort of medical communications with them, they know that they can bring this device in. There are many medical, and the record is replete with times where they write down that having trouble with communication, need sign language help, and they post that he is having trouble with vocalizing or reading lips, things of that sort. So these are things that they note in the record that there is frustration or that there is problems with communication, but they don't get an interpreter for that very instance. And then you don't see, well, I've come back with an interpreter to explain what I previously tried to communicate with him. Let's hear from the city and then we'll hear you. Okay. Thank you. Good morning, Your Honors. May it please the court, my name is Elizabeth Friedman. And I am appearing for defendant appellee, New York City Health and Hospitals Corporation. Your Honor, if one looks at all the medical records here, the totality of the medical records, and they are voluminous in this case, you look at all of the interactions that Mr. Berry had with hospital staff, the hospital records indicate that the hospital staff was extremely attentive to his needs and to communication efforts with this patient. Certainly there is not a single instance where the staff was not aware that Mr. Berry was deaf or hard of hearing and in fact documented that fact and also documented carefully all the efforts that were made to communicate and to make sure that there was effective communication with this patient. Those efforts include not only the VRI, Video Remote Interpretation Machine, at Lincoln Hospital, and also in-person interpreters virtually every day of his stay at Jacoby Hospital. They also include lip reading, which clearly plaintiff admits that Mr. Berry could read lips. In fact, that's how he communicated with his family. The hospital staff also indicated that he could use his voice. There were times when he could speak and he had verbal capabilities. Are these not factual issues? These are all disputed and it seems to me quite disputable just how much he was able to communicate through speech. Well, the hospital staff were making the efforts. It was whether or not there was a violation of the ADA and the Rehabilitation Act, and the hospitals here clearly documented their efforts to make sure that he understood, and each and every interaction, as the district court found, at each and every interaction the staff documented what efforts were made to ensure that, but the district court also correctly found that he was, in fact, supplied with sign language interpretation at critical junctures of his medical treatment. So here you have a person who's been undergoing dialysis, hemodialysis, for months. You are suggesting we should be looking at the totality of the treatment in assessing this question. Because the medical care is an ongoing, it was ongoing. And I would say yes, you do need to look at the totality of the treatment. You need to look at the context of each contact, of each medical intervention. Some were more invasive than others. If there were some significant event at which he would not, he was not given an adequate opportunity to communicate, that could be a stand-alone violation. If, in fact, there were individual instances where he was not supplied, perhaps, for example, the video remote interpretation machine, there is testimony, there's evidence that the staff at that moment did not know how to use it. However, that's a single violation, which does not amount to, perhaps, it's a single violation. Maybe. But it does not necessarily, it does not amount to a deliberate indifference to entitle plaintiff to damages. And I would argue that the... On October the 3rd, 2013, where, I think this is one of the situations where he checks himself out. He checked himself out against medical advice. I believe that was on October 29th, if I'm not mistaken, on the date. I'm looking at October the 3rd. This is at Lincoln Hospital. Yes. The staff are attempting to explain the seriousness of his situation, the need for admission and treatment, the potential dangers of his condition, including morbidity and death. And one doctor went so far as to arrange a psych evaluation for his decision capacity because he had very poor insight about his condition. And during that period, there was no interpreter. There was no interpreter at that time. However, he was there for hemodialysis treatment on October 3rd at Lincoln Hospital. Is that what you're referring to? So his treatment was limited to hemodialysis at that point. I'm not so much worried about the treatment per se of the hemodialysis, but it sounds like what's going on is they're trying to impress on him the seriousness of his situation, and they're not getting through to the point where they're worried that he can't understand anything. Now, I don't know whether that is because he has limited intellectual capacity and there's nothing much they could ever have done or whether that's because he can't hear and understand what they're saying or ask questions, but the fact that I can't figure that out, doesn't that suggest a jury question as to whether he needed an interpreter in that interaction? No, Your Honor, because the notes indicate that he was able to understand the voice. The staff, they were trying to explain to him, but I believe that basically he was verbal, he had statements, and there was no interpreter present, but there were interpreters present at other times in conjunction with that particular visit. My understanding, I want to be sure I do understand it correctly, is that you're saying that even if he did not understand the attempt to impress the seriousness of his situation on him on October 3rd, he understood the treatment he got on that day to the extent that his situation was serious, that was an ongoing problem and was addressed to him on other days when he had an interpreter? Is that what you want us to conclude, that the record supports that as a matter of law? It certainly, the record certainly supports the fact that you need to look at each, the interaction in the context of his ongoing medical treatment and that in fact he did get interpreters for most of his, for many of the visits and the critical visits at Lincoln Hospital and including every day at Jacoby Hospital. And yes, the fact is that if on that particular time, let's assume even though the staff did document what was happening and that he had interpreters for his medical care at other critical times, certainly the staff was able to effectively communicate with him even on that date because if they hadn't been able to communicate with him on that date, they would have, they would have done something differently. And even assuming for the sake of argument that that one day there was a technical violation and there should have been at that very moment an interpreter, again, the record does not reflect that there is deliberate indifference here. I also want to just get back to the VRI machine. The nurse supervisor who was on duty was very upset that in fact the staff didn't know how to use the VRI machine on that particular date. And she ordered them to go back and read the manual. That is just the opposite of deliberate indifference. So even assuming that's a violation, which we would say one instance. As I understand it, your argument is, and this is the way that I understood it coming in, one of your principal arguments is that we can assume a violation, a technical violation, but in connection with the claim for declaratory judgment that's been abandoned and in connection with compensatory damages, that claim. Without deliberate indifference, exactly, without deliberate indifference, there cannot be compensatory damages under the law of the circuit. And those are the only claims. And that means that barring that, yes, the court should affirm the grant of summary judgment. And we are not conceding that there were any violations here. But even assuming for the sake of argument that individual interventions, that individual contacts with the hospital staff did constitute a violation, there certainly can be no finding of deliberate indifference. And there's no claim, the plaintiffs have abandoned any claim for declaratory judgment. And he is not entitled, they are not entitled to compensatory damages. Certainly they haven't shown any injury. Certainly Mr. Berry never himself requested a sign language interpreter nor were any complaints or grievances filed with respect to his treatment. And the two times that his sister, Denise Berry, did request a sign language interpreter, those requests were granted. Mr. Berry himself had turned down sign language interpreters. The time at Jacoby Hospital when he left against medical advice, in fact a sign language interpreter was provided and explained to him the dangers of leaving against medical advice. That sign language interpreter was brought in by the social worker, even though Mr. Berry had previously declined sign language interpretation. So yes, Your Honor, there's no deliberate indifference and there can be no compensatory damages and there's nothing else here for plaintiff to get on this record. In fact, the court should affirm the grant of summary judgment and dismiss the complaint. Thank you, Your Honor. Ms. Brzezinski, you have three minutes. Yes. So to address that last argument about deliberate indifference and the fact or the argument that you've abandoned your request for declaratory judgment and that there's really no way to look at this record to conclude that the hospital was engaged in any form of deliberate indifference or compensatory damages. There is evidence of deliberate indifference. We had deposed 30B6 witnesses from the hospitals and the Lincoln Hospital 30B6 witness indicated that the hospital was not aware of any policies regarding the evaluation of a deaf patient's communication abilities. They had never provided any training on how to identify communication needs to a deaf patient and were not aware of how the nursing department at Lincoln trained medical staff on how to communicate and accommodate deaf patients. This lack of knowledge in ensuring that . . . Is that enough to show deliberate indifference as to Mr. Berry? Yes. In conjunction with . . . Has your client provided a sign language interpreter? I don't know the exact number. It seems hard given that it is scores of times. How we can say that there was deliberate indifference? Well . . . I mean, whether or not there was a formal training program, they routinely were supplying him with a sign language interpreter. How are you going to argue deliberate indifference? So giving the October 3 incident as an example, they were trying to explain all these things to him, indicated that he had poor insight into his condition, and decided to go forward without the benefit of a sign language interpreter being there. He went forward that day with a treatment that he had received on various occasions. What he didn't understand was the scope of the need for other treatment, and before other treatment was pursued, and it was pursued, he was given a sign language interpreter. The standard is not whether he broadly understood what was going on. You have to look at every single instance, and it's a fact-specific inquiry, and case law that I've cited in my briefs clearly state that. You can look at Venezuela. You can look at Silva. You can look at Pierce. You can look at Wright. And all of those say that this is a fact-specific inquiry. You cannot look at broadly that just because a similar procedure might have been given later on with an interpreter, that that's sufficient for them to meet their burden. But the problem here, it seems to me, really with the case is that, unfortunately, Mr. Berry is deceased, and he's not here to tell us what he understood or did not understand. So except in the couple of instances where there's testimony from Denise Berry about specific instances, what we mostly are trying to draw on is the hospital record, which contains the representations of medical personnel on some occasions that we were able to make ourselves understood. Now, one might have some ground for skepticism about that, but it's difficult to oppose something with nothing. We have no other account of those communications other than the account of the doctors who said, we did what we could, and we thought it was good enough. So what I'm saying is that this should go in front of a jury. These are disputed issues. There's enough evidence in the medical record. You have to have evidence from which the jury could conclude that the man didn't understand, despite what the doctors said. And if you look at the briefing and the appendix, there are instances where there's clearly records in the medical records that he didn't understand what was going on in that particular instance or that there were issues communicating in that particular instance. See, what I don't understand is, you know, it's fine to say each individual instance stands on its own. So you have an instance where a doctor is trying to communicate something and can't get through. I'm not getting anywhere. Then he goes away, and then somebody comes back later with an interpreter. I'm not sure that I understand what the problem is in that instance if the attempt to communicate fails and then later an interpreter is provided, and how are we to infer that just the fact that there was no interpreter at the first attempt is a violation? But in most instances, there was no evidence that they actually came back to re-explain with an interpreter what had happened. That was an inference that you have to draw in favor of the movement here. I'm not sure that's so obvious to me. I mean, the man's many problems are reflected in the various course of treatments that he got. And before they were conducted, there seems to have been at least one session with an interpreter. So, you know, when they tried globally to explain all his myriad problems on October 3rd, if that's how we read that, he didn't understand them. But then there's a course of treatment over an extended period of time during which before particular procedures, he speaks with the doctors with an interpreter. I mean, you're not suggesting that they should have held him there until they got an interpreter on October 3rd. Well, they had access to immediately get a video remote interpreting machine, which they have readily available and they can get within minutes, and they didn't do that. But they didn't conduct any procedures, and you're not saying that he suffered any adverse consequences from the fact that he didn't understand that day but then had it explained to him with an interpreter a week later, a month later, whenever the procedures took place. But there's no evidence that what was discussed on that particular day was re-explained to him. And again, you're treating someone with a disability way differently, and that's discrimination. You're not treating them on equal footing, which is what the law and what the regulations require. Do you agree, just to get back to the last point from your adversary, that if you've abandoned your request for declaratory judgment and if there is no basis in this record for compensatory damages, that that's an alternative way to affirm in this case? If, I'm not saying that. No, I don't agree with that. I do think that for us to get declaratory judgment, we have to show that there would be some sort of benefit to this litigation. And I think that the court could award declaratory relief here. But assume for the sake of argument, just bear with me, that you do not have available to you any declaratory judgment and that you don't have compensatory damages available to you. Is that a basis for us to affirm? I don't think so. Why not? Because we found a violation here. Nominal damages would be available? Yeah, nominal damages would be available. I just tried a case in the Eastern District of Louisiana where we had a dead plaintiff and the court only awarded nominal damages. That's available under this? Yes, Your Honor. Thank you. Thank you. Case under advisement. We have two more cases on our calendar today, but they're both being submitted, so we stand adjourned. Thank you. Court is adjourned.